IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANDREW FRIEDMAN, #357313        *
      Plaintiff,
  v.                           *    CIVIL ACTION NO. DKC-10-248

WARDEN, et al.                  *
      Defendants.
                             ***

## **MEMORANDUM OPINION**

On February 1, 2010, Andrew Friedman ("Friedman"), an inmate formerly confined at the Roxbury Correctional Institution ("RCI") in Hagerstown, Maryland, filed a letter with the court seeking a preliminary injunction[1] to be transferred out of the "western region."[2] He claimed that he was: (1) twice assaulted by anti-Semitic correctional officers for trying to practice his religion; (2) transferred to the Maryland Correctional Institution in Hagerstown, where kosher

---

[1] Friedman filed an independent Motion for Preliminary Injunction alleging that he was threatened with harm for filing complaints, was called a "rat" and "snitch" by correctional officers, and experienced past incidents of unconstitutional conditions of confinement and the use of offensive anti-Semitic epithets. ECF No. 10. He sought transfer out of the western region of state prisons. On July 6, 2010, the Motion was denied under *Winter v. Natural Resources Defense Council, Inc.*, 129 S.Ct. 365, 374 (2008).

[2] According to Division of Correction Data Processing, Friedman was transferred to the Eastern Correctional Institution ("ECI") on September 24, 2010. The transfer is confirmed by Correctional Officer Whiteman's Declaration. *See* ECF No. 25. Under 42 U.S.C. § 1983, an actual controversy must exist at all times while the case is pending. *See Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974). It is possible for events subsequent to the filing of the complaint to make an injunctive relief request moot. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). This is so even though such a case presented a justiciable controversy at an earlier point in time and an intervening event rendered the controversy moot. *See Calderon v. Moore*, 518 U.S. 149, 150 (1996). Indeed, "[w]here on the face of the record it appears that the only concrete interest in the controversy has terminated, reasonable caution is needed to be sure that mooted litigation is not pressed forward, and unnecessary juridical pronouncements on even constitutional issues obtained…" *See Lewis v. Continental Bank* Corp, 494 U.S. 472, 480 (1990). With his transfer, Friedman's request for injunctive relief was mooted when he was transferred out of the western prison region to ECI.

"religious" diets are not provided; and (3) transferred to RCI, where Sgt. Hinkle,[3] who ordered his assault at the Maryland Correctional Training Center ("MCTC"), came to his cell at RCI and threatened to have his relative, an officer at RCI, assault Friedman if he pressed criminal charges. ECF No. 1.

The letter, which named no party defendants and sought no particularized relief, was construed as a 42 U.S.C. § 1983 civil rights action raising a failure-to-protect claim regarding Friedman's safety concerns with the western region prisons of the Maryland Division of Correction ("DOC"). ECF No. 1. In a court-ordered Supplemental Complaint filed on February 24, 2010, Friedman added the names of Commissioner Jon P. Galley, Assistant Warden Wayne Webb, Warden Kenneth Horning, Sgt. Hinkle, Officer Younker, Officer Richie, Officer Henry, Lt. Jon Whiteman, Chaplain Ishmael, Officer Dunn, and Officer Gelespi as party Defendants. ECF No. 3. He raised a cornucopia of allegations, claiming that on September 4, 2009, MCTC Sgt. Hinkle ordered Officers Richie and Henry to place him in an isolation cell for trying to receive a kosher diet and a shower. He states that he was "dragged down a tier by Richie and Henry and thrown down steps" and into a cell, placed on a bag lunch, received no hygiene products for five days, and the cell was not equipped with a working toilet. Friedman also states that on August 8, 2009, Officer Younker came to his cell and "assaulted him." ECF No. 3.

In attachments to the Supplemental Complaint, Friedman seemingly contends that Defendant Galley was aware of his fear of the western region of the DOC due to the anti-

---

[3] An attachment to the letter concerns Friedman's administrative remedy procedure ("ARP") grievance which claimed that Sgt. Hinkle denied him a shower and placed him in an isolation cell on or about September 4, 2009. ECF No. 1 at Attachment.

2

Semitism of officers and assaults against Friedman that had occurred during his prior incarceration. ECF No. 3 at Attachments. He further claims that he was received at MCTC on June 25, 2009, and noticed that a kosher diet did not exist on the sign up form for a "religious sheet." He complains that Chaplain Ishamel only allowed him to sign up for the religious diet on September 3, 2009, in response to a grievance and he could not receive "religious materials" while on MCTC lock up. *Id*. Friedman complains that Officer Dunn would not allow him supplies to clean his cell on Sundays, even though he explained that Saturday is his religious Sabbath day. He alleges that Sgt. Hinkle and Lt. Whiteman were responsible for ensuring his safety as they were the segregation unit commander and lieutenant. Friedman again contends that on August 8, 2009, Younker sprayed him with a chemical agent, kicked him "badly," and called him a "fucken Jew." He states that on September 4, 2009, he was refused his religious diet by Hinkle and Ritchie and received neither dinner nor shower. *Id.* at p. 8. Friedman alleges that Hinkle ordered Richie and Henry to house him in the isolation cell because he kicked his door while seeking a shower and dinner. He contends that he told Richie and Henry that he was having health problems from not eating and had not had a shower in 8 days, but was told that Hinkle had ordered him to be moved. Friedman reiterates his claim that Richie and Henry dragged him down a tier and threw him down steps into the isolation cell. He states that after engaging Richie in conversation about the return of handcuffs, Richie threw him to the floor, kicked him, beat him badly, and denied him medical attention. *Id*. at p. 9.

Friedman states that on September 11, 2009, he was transferred to the Maryland Correctional Institution at Hagerstown ("MCIH"), which does not provide kosher diets. He

asserts that he "put in for a transfer to a prison that does Jewish Religious beliefs" and was sent to RCI on approximately October 4, 2009. ECF No. 3. at p. 10. Friedman then accuses RCI Officer Gilespi of telling him on January 23, 2010, that he would not receive a shower for two weeks for trying to get a kosher diet. The Supplemental Complaint seeks compensatory and punitive damages and declaratory relief.

On September 1, 2010, Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. ECF No. 16. Friedman filed an opposition response and Defendants filed a reply. ECF Nos. 21 & 25. For reasons to follow, Defendants' Motion, construed as a motion for summary judgment, shall be granted.

Under the 2010 revisions to Fed. R. Civ. P. 56(a) & (c):

A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Under Supreme Court standard, this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

4

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988).

The Prison Litigation Reform Act ("PLRA") generally requires a prisoner to exhaust administrative remedies before filing suit in federal court. Title 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The Supreme Court has interpreted the language of this provision broadly, holding that the phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Thus, the exhaustion provision plainly extends to Friedman's

allegations. His complaint must be dismissed, unless he can show that he has satisfied the administrative exhaustion requirement under the PLRA or that defendants have forfeited their right to raise non-exhaustion as a defense. *See Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003).

The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Id.* at 530; *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or final administrative review after the prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003), *abrogated on other grounds by Woodford v. Ngo*, 548 U.S. 81 (2006) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not also seek judicial review); *Gibbs v. Bureau of Prisons*, 986 F.Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process).

In Maryland, filing a request for administrative remedy with the Warden of the prison in which one is incarcerated within thirty calendar days of the incident (or of the date the inmate first gained knowledge of the incident or injury) is the first of three steps in the ARP process provided by the Division of Correction to its prisoners. If this request is denied, the prisoner has thirty calendar days to file an appeal with the Commissioner of Correction. If this appeal is denied, the prisoner has thirty days in which to file an appeal to the Executive Director of the

IGO. *See* Division of Correction Directive 185-002.VI.L-N (copy attached); *see also* Md. Code Ann. Corr. Serv. §§ 10-201 to 10-209.

Defendants, who have raised non-exhaustion as an affirmative defense, provide a verified exhibit which shows that from September 1, 2009 to August 2, 2010, Friedman filed eighteen grievances with the IGO. ECF No. 16, Ex. L, Oakley Decl. Six of the grievances concerned issues raised in this Complaint and five were dismissed by the IGO because Friedman had not properly exhausted the ARP process or failed to respond to a letter from the IGO requesting additional information.[4] The remaining grievance was dismissed because Friedman's transfer to

---

[4] According to Scott Oakley, the Executive Director of the IGO, Friedman filed the following grievances which relate to claims filed in this case:

IGO No. 2009-1978, alleging that Officer Younker refused to feed him, used excessive force, kicked him, and sprayed mace in his face on August 8, 2009. The grievance was administratively dismissed for Friedman's failure to properly invoke and exhaust the ARP process.

IGO No. 2009-2239, making claims of anti-Semitism, raising complaints regarding kosher diet, medical care, threats by staff and staff failing to comply with medical orders. The grievance was administratively dismissed for Friedman's failure to properly invoke and exhaust the ARP process.

IGO No. 2009-2382, complaining about his ability to practice his religion, medical care, and a transfer to an institution that did not serve kosher meals. The grievance was administratively dismissed after Friedman failed to respond to a letter from the IGO requesting additional information or documentation.

IGO No. 2009-2562, filed as an appeal, complaining that Officer Hinkle had improperly denied him a shower and placed him in an isolation cell on September 4, 2009. The grievance was administratively dismissed for Friedman's failure to properly invoke and exhaust the ARP process.

IGO No. 2009-2815, filed as an appeal, related to Friedman's complaint that he was not being provided a kosher diet tray following his transfer to MCIH on September 11, 2009. The grievance was dismissed as moot upon his transfer to RCI on October 2, 2009 for the purpose of receiving a kosher diet.

IGO No. 2010-0058, in which Friedman claimed that after his June 25, 2009 transfer to MCTC staff failed to ensure his security, safety, and well-being; engaged in anti-Semitic disrespect; and he experienced other religious, and medical and dietary problems. The grievance was administratively dismissed for Friedman's failure to properly exhaust the ARP process.

*See* ECF No. 16, Ex. L.

RCI mooted his complaint about MCIH's lack of kosher meals.[5]  ECF No. 16, Ex. L, Oakley Decl.  At no point does Friedman dispute the record or allegations of non-exhaustion.  While this court is "obligated to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials," *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007), there is no allegation here that Friedman, through no fault of his own, was prevented from

---

[5] To the extent that this particular claim may be considered exhausted under § 1997e(a), the court finds no constitutional violation. Defendants affirm that when he arrived at MCTC on June 25, 2009, Friedman completed a religious preference registration form and checked the line for Judaism. ECF No. 16, Ex. A at p. 2.  He did not, however, check the lines indicating what form of Judaism he practiced.  Defendants therefore state they were not placed on notice as to whether Friedman kept kosher or was prohibited from working on the Sabbath.  Also, on June 25, 2009, Friedman completed a meal preference plan of either the master cycle menu or the lacto-ovo vegetarian diet.  He did not advise MCTC staff that he intended to take kosher meals, but instead chose the master cycle menu, which provides protein primarily through fish, poultry, and meat, with the exception of pork and pork products. *Id.*, Ex. A at p. 3.

Defendants state that a kosher diet is available to inmates at MCTC and it is the only religious diet in the Division of Correction ("DOC") system.  The Muslim imam at MCTC is responsible for administering the activities of all non-Christian groups at that prison.  He met with Friedman on two occasions. First on July 14, 2009, he saw Friedman in his office due to his interest in signing up for the kosher diet.   ECF No. 16, Ex. B at Abdulmalek Decl. and pgs. 2-6.  The requirements of the diet were explained to Friedman, but he refused to sign off on the Kosher diet sign-up form which included language indicating he would comply with the requirements.  On September 3, 2009, Friedman met with the imam and he signed off on the religious diet agreement form and was added to the religious meal plan. A few days later, Friedman was transferred to MCIH.

Defendants acknowledge that the religious diet plan was not available at MCIH in September of 2009.  When Friedman advised MCIH staff that he had commenced the kosher diet at MCTC and requested a transfer to a prison which offered the diet, arrangements were made to transfer him to RCI where the religious diet was available.  *Id.*, Ex. A at pgs. 6-7.  Friedman arrived at RCI on October 2, 2009.  *Id.*, Ex. A at p. 8. Correctional Officer Gillespie, who works on the RCI segregation unit, affirms that if an inmate needs a kosher tray, it is reported to the Dietary Officer and a tray is provided to the unit. *Id.,* Ex. J, Gillespie Decl.  Gillespie claims that this is a routine procedure.

The record shows that from his arrival at MCTC through September 3, 2009, when he officially signed on to the religious diet program, Friedman ate a non-kosher diet and did not comply with the requirements that he adhere to the dietary choice for six months.  While he had indicated his religion of choice was Judaism, he did not designate what branch of Judaism he practiced, *i.e.*, Orthodox, Conservative, or Reform, so as to otherwise place personnel on notice that he required a kosher diet. Although he initially refused to sign onto the religious diet program, Friedman was permitted to enroll in the plan at MCTC. Eight days after his enrollment, however, he was transferred to MCIH, which did not have a religious diet plan, in September 2009. Informed of the problem, he requested a transfer to an institution which offered the diet. Arrangements were made by classification personnel within the month, not an unreasonable period of time, to transfer Friedman to RCI on October 2, 2009.  The court finds no First Amendment violation.

availing himself of the ARP process. *See Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). Instead, Friedman through his own actions failed to follow through with the full ARP process offered by the DOC. Therefore, Defendants' motion for summary judgment shall be granted. A separate Order follows.


Date: __February 28, 2011__                              _____/s/_____
                                                                          DEBORAH K. CHASANOW
                                                                          United States District Judge